IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>               Respondent,<br><br>       v.<br><br>DANNY HENRY COLEMAN, JR.,<br><br>               Appellant. | No. 86629-0-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

HAZELRIGG, C.J. — Danny Henry Coleman, Jr., appeals from the judgment and sentence entered on a jury's verdict convicting him of two counts of rape of a child in the first degree, two counts of child molestation in the first degree, and one count of incest in the second degree, all committed against his daughter, C. The jury further found that all were crimes of domestic violence and a number of aggravating factors were proved by the State. He asserts that the trial court deprived him and his acquaintance of the right to a public trial, the prosecutor committed misconduct during voir dire and closing argument, his trial counsel was ineffective, and evidentiary and instructional errors, independently and cumulatively, require reversal.[1] Although we conclude that the State engaged in misconduct, Coleman fails to establish reversible error and, thus, we affirm.

---

[1] Coleman also assigns error to other aspects of the trial in this matter. As discussed herein, these assignments of error similarly do not merit appellate relief.

FACTS

Danny Coleman's daughter, C., was born in February 2008. In early 2019, when she was 11 years old, she reported that Coleman had repeatedly sexually abused her since she was 3 or 4 years old. The State charged Coleman with two counts of rape of a child in the first degree (counts 1 and 2), two counts of child molestation in the first degree (counts 3 and 4), and one count of incest in the second degree (count 5). The State further alleged that all five counts were domestic violence offenses and provided notice of its intent to seek an exceptional sentence based on a number of aggravating factors as to each count.

A five-day jury trial later commenced. Before voir dire and while in the presence of Coleman, his legal counsel, and the prosecutor, the trial court briefly discussed whether the courtroom could accommodate the 48-member jury pool. During this discussion, the court began to address an individual seated in the front row of the gallery and the individual identified himself as one of Coleman's acquaintances. However, Coleman interrupted the judge and stated, "He can step out. That's fine."

The judge later brought the jury pool into the courtroom for voir dire and provided introductory remarks, including informing the prospective jurors that if they felt that the questioning by the court or the attorneys pried unnecessarily into their personal lives or invaded their personal privacy, they could indicate as much or request to answer such questions outside of the presence of the jury pool. The court then read the charges to the jury, swore in the jury pool, conducted its own general voir dire, and directed the State to begin its voir dire.

The prosecutor reiterated that the charges against Coleman involved rape of a child, child molestation, and incest and then asked the jury pool whether anyone had "an issue or a problem or a concern about being a juror in this case dealing with these type [sic] of charges?" Twelve of the forty-eight prospective jurors raised their numbers in response.

The prosecutor indicated that for those twelve jurors, the State was seeking detailed information about not only the jurors' lived experiences relating to sexual abuse, but also similar experiences of their "family members, friends, you know, anything like that." The prosecutor did not attempt to remind the jurors of the possibility of individual examination outside of the presence of the jury pool with regard to any line of questioning. Instead, while in the presence of the entire jury pool, he elicited, one-by-one, the jurors' experiences with sexual abuse, including child sexual abuse. He asked them about their own experiences or those of their friends or family. And, in response to their disclosures, he frequently followed up with questions regarding the details and fallout of such experiences. During the course of the State's voir dire, Coleman's legal counsel did not object.

The jury was later impaneled and sworn, and the State presented its case in chief over a period of four days. On the fifth and final day of trial, Coleman testified in his own defense. During his testimony, the State objected to a pair of questions posed to him by his attorney, which the court sustained. In response to the court's rulings, Coleman's attorney did not make an offer of proof. Instead, he requested that the court permit him to move on to another line of questioning, which the court granted, and defense counsel proceeded accordingly.

Thereafter, during a portion of the State's closing argument regarding C.'s delayed disclosure of Coleman's sexual abuse, the prosecutor referenced the jury pool members' voir dire disclosures, which he himself had elicited, about their or their friends' or relatives' experiences with delayed disclosure of child sexual abuse. Coleman did not object to this line of argument.

The jury convicted Coleman as charged and also found that the State had proved the qualifying family relationship between him and C. such that these were crimes of domestic violence. The jury further found by special verdict that the two counts of rape of a child and two counts of child molestation were part of an ongoing pattern of sexual abuse, Coleman used his position of trust to facilitate the crimes, and each of the crimes of conviction was an aggravated domestic violence offense. Despite the special verdict findings, the court declined to impose an exceptional sentence and imposed indeterminate sentences on counts 1 through 4 up to a maximum of life in prison and a determinate sentence of 60 months in prison on count 5, all to be served concurrently, as well as a period of community custody on counts 1 through 4 upon release.

Coleman timely appealed.

ANALYSIS

I.      Right To a Public Trial

Coleman first asserts that the trial court deprived him and his acquaintance of the right to a public trial. This is so, according to Coleman, because the court participated in the exclusion of his acquaintance from voir dire without first advising either of them of the constitutional right to observe the trial proceeding and

conducting the requisite legal analysis on the record. Because the trial transcript does not support Coleman's claim that the court expressly or implicitly ordered closure of the courtroom, we disagree.

Both the Sixth Amendment to the United States Constitution and article I, section 22 of the Washington State Constitution guarantee a defendant in a criminal matter the right to a public trial. *State v. Wise*, 176 Wn.2d 1, 9, 288 P.3d 1113 (2012). Furthermore, "[t]he right of a public trial is also vested more broadly with the public." *Id.* "A public trial is a core safeguard in our system of justice. Be it through members of the media, victims, the family or friends of a party, or passersby, the public can keep watch over the administration of justice when the courtroom is open." *Id.* at 5-6. As pertinent here, the "right to public trial . . . includes pretrial phases such as . . . voir dire." *State v. Njonge*, 181 Wn.2d 546, 553, 334 P.3d 1068 (2014) (*Njonge* II); *see also Presley v. Georgia*, 558 U.S. 209, 213, 130 S. Ct. 721, 175 L. Ed. 2d 675 (2010) (confirming right to public trial extends to voir dire of prospective jurors). "Whether a criminal accused's constitutional public trial right has been violated is a question of law, subject to de novo review on direct appeal." *State v. Easterling*, 157 Wn.2d 167, 173-74, 137 P.3d 825 (2006). "Such a claim may be raised for the first time on appeal." *Wise*, 176 Wn.2d at 9.

In *State v. Bone-Club*, our Supreme Court considered a "trial court's responsibility to protect a defendant's right to a public trial" and identified five criteria to be considered by the trial court in determining whether to order the closure of a courtroom. 128 Wn.2d 254, 256-59, 906 P.2d 325 (1995). In so doing,

the court held that a trial court must "engage in this case-by-case weighing of the competing interests before ordering" a courtroom's closure. *Id.* at 256. Given that, a predicate to the *Bone-Club* analysis is a determination that the trial court actually ordered the closure of a courtroom. *See In re Pers. Restraint of Yates*, 177 Wn.2d 1, 27, 296 P.3d 872 (2013) ("We must first determine whether the courtroom was actually closed.").

Therefore, "[a] defendant asserting violation of his public trial rights must show that a closure occurred." *Njonge* II, 181 Wn.2d at 556. We have recognized that a courtroom closure "can occur even in the absence of an explicit court order." *State v. Njonge*, 161 Wn. App. 568, 575, 255 P.3d 753 (2011) (*Njonge* I), *rev'd on other grounds*, 181 Wn.2d 546, 334 P.3d 1068 (2014); *see also Njonge* II, 181 Wn.2d at 556 ("The Court of Appeals properly concluded that a court need not *order* a closure to violate the public trial guaranty."). However, a "fair reading of the transcript" must lend itself to the conclusion that a closure occurred. *Njonge* II, 181 Wn.2d at 557. In our review, we "'will not, for the purpose of finding reversible error, presume the existence of facts as to which the record is silent.'" *Id.* at 556 (internal quotation marks omitted) (quoting *State v. Jasper*, 174 Wn.2d 96, 123-24, 271 P.3d 876 (2012)).

A video recording captured the interactions now challenged on appeal and establishes that an unidentified individual was seated in the front immediately behind Coleman and his defense counsel in the otherwise empty courtroom gallery. The first conversation, which occurred immediately before jury selection, included the following exchange between the trial court and its judicial assistant

regarding whether the jury pool could fit into the courtroom:

> [JUDICIAL ASSISTANT]:  We can get [the entire panel] all in at one time.
> THE COURT:  Sixty?
> [JUDICIAL ASSISTANT]:  We don't have sixty, because of the ones that were already excused.
> THE COURT:  I don't think we can.
> [JUDICIAL ASSISTANT]:  According to the seating chart [Indiscernible].
> THE COURT:  Okay.  *Well we will try then*.  We've never—
> [JUDICIAL ASSISTANT]:  The gentleman in the back is going to have to—
> THE COURT:  Yeah, we've never gotten—I don't think we've ever gotten more than forty-eight in here.
> [JUDICIAL ASSISTANT]:  We can do it.
> THE COURT:  Okay.  *We're going to try*.

(Emphasis added.)  Shortly thereafter, the discussion continued and included the following exchange between the trial court, Coleman, defense counsel, and the person seated behind the defense:

> THE COURT:  Why don't we do this, and I'm going—Sir, what's your connection to this case?
> UNIDENTIFIED SPEAKER:  I am a personal friend of the defendants.
> THE COURT:  Okay.  *We're gonna have to have you—*
> THE DEFENDANT:  *He can step out.  That's fine.  He's just here—*
> THE COURT:  *Okay.  Yeah, he has a right to be in.  I don't want to exclude him, but for purposes of—*
> UNIDENTIFIED SPEAKER:  *I understand the need for—*
> THE DEFENDANT:  *Yeah, he's only here for me*.
> [DEFENSE COUNSEL]:  *And it's a fairly boring process.*
> THE COURT:  All right.

(Emphasis added.)  The video recording shows that Coleman's acquaintance left the courtroom immediately after the second exchange and that Coleman pointed the way out, gave his friend directions, and told his friend that he would call him when voir dire was over.

- 7 -

On appeal, Coleman asserts that by "initiating a challenge to the presence of the observer, and then failing to affirmatively address the observer's rights, [the court] *de facto* excluded him from the voir dire portion of the trial." However, the record does not fairly support Coleman's characterization of the court's conduct in this matter. As an initial matter, the record does not establish that the court expressly ordered the closure of the courtroom. Coleman, for his part, does not dispute that on both occasions when the court was attempting to address the courtroom, the court was interrupted by Coleman, his attorney, or the individual in question, and that, as a result, the court did not expressly order that the courtroom be closed.

Therefore, Coleman's remaining assertion is that the trial court's conduct constituted an *implicit* order to close the courtroom. However, the record does not adequately corroborate this characterization either. Although Coleman states that the court "expressed the intent to remove the observer from the courtroom" as the "court's unfinished sentence can reasonably be interpreted as 'I don't want to exclude him, but for purposes of—*jury selection, I will*,'" the court's statement could also reasonably be completed as follows: "I don't want to exclude him, but for purposes of—*jury selection we're going to have to ask him to sit in the back*."[2] Indeed, the court had been discussing the seating capacity of the courtroom and had just stated that Coleman's friend "has a right to be in. I don't want to exclude him." Given such ambiguity in the record, and as in *Njonge* II, we "'will not, for the purpose of finding reversible error, presume the existence of facts as to which the

_____

[2] Furthermore, as indicated by Coleman in his briefing on appeal, "the courtroom, even with jurors present, still had additional seating available in the back row."

- 8 -

record is silent.'" 181 Wn.2d at 556 (quoting *Jasper*, 174 Wn.2d at 123-24). Therefore, the record does not fairly reflect that the trial court closed the courtroom during voir dire. Thus, the predicate required for an on-the-record *Bone-Club* analysis did not occur, and Coleman has not established that the trial court deprived him or his companion of the right to a public trial.

II.     Prosecutorial Misconduct

Coleman next asserts that the State committed misconduct during its voir dire and closing argument which prejudiced him. Although we agree with Coleman that the State engaged in misconduct during voir dire and its closing argument, we ultimately conclude that those errors do not mandate reversal.

In reaching this determination regarding the State's misconduct, we rely on the expansive jurisprudence addressing the unique role of a prosecutor in pursuing criminal convictions on behalf of the people of the State of Washington and the constitutional limits imposed on such endeavors. *See, e.g.*, *State v. Zamora*, 199 Wn.2d 698, 512 P.3d 512 (2022); *State v. Loughbom*, 196 Wn.2d 64, 470 P.3d 499 (2020); *State v. Emery*, 174 Wn.2d 741, 278 P.3d 653 (2012); *State v. Thorgerson*, 172 Wn.2d 438, 258 P.3d 43 (2011); *State v. Monday*, 171 Wn.2d 667, 257 P.3d 551 (2011).

As analyzed at length herein, the trial prosecutor's approach to questioning the potential jurors on the particularized details of their experience with sexual assault and its aftermath, along with questioning them on the experiences of their family and loved ones, all while in the presence of the rest of the venire, crossed the line into misconduct. Additionally, the trial prosecutor's decision to then refer

back to those improper questions during his closing argument constituted further misconduct. However, because Coleman did not object to any of this misconduct in the trial court and, now on appeal, fails to establish that this misconduct could not have been cured by an instruction to the jury, he has not demonstrated prejudice such that reversal is required.

### A. The State Engaged in Misconduct during Voir Dire

Coleman asserts that the State engaged in misconduct during voir dire. We agree.

### 1. Legal Standard and Burden of Proof

Our federal and state constitutions each guarantee the right to an impartial jury in a criminal trial. U.S. CONST. amends. VI, XIV; WASH. CONST. art. I, §§ 3, 22. In setting forth the relationship between this right and prosecutorial misconduct, our Supreme Court has instructed as follows:

> We have long recognized that the constitutional "right to a jury trial includes the right to an *unbiased* and *unprejudiced* jury." *State v. Davis*, 141 Wn.2d 798, 824, 10 P.3d 977 (2000) (emphasis added). As a quasi-judicial officer and a representative of the State, a prosecutor owes a duty to a defendant to see that their rights to a constitutionally fair trial are not violated. Thus, a claim of prosecutorial misconduct directly implicates the constitutional right to a fair trial.
>    Generally, to prevail on a prosecutorial misconduct claim, a defendant who timely objects must prove that the prosecutor's "'conduct was both improper and prejudicial in the context of the entire trial.'" *State v. Loughbom*, 196 Wn.2d 64, 70, 470 P.3d 499 (2020) (quoting *State v. Walker*, 182 Wn.2d 463, 477, 341 P.3d 976 (2015)).

*Zamora*, 199 Wn.2d at 708-09.

- 10 -

Coleman did not object to the conduct in the trial court that he now challenges on appeal. In such a situation, our Supreme Court has directed that

> we apply a heightened prejudice standard where the defendant must also show that the prosecutor's improper and prejudicial conduct was "'so flagrant and ill intentioned that [a jury] instruction would not have cured the [resulting] prejudice.'" *Loughbom*, 196 Wn.2d at 70 (internal quotation marks omitted) (quoting *Walker*, 182 Wn.2d at 477-78). In other words, the defendant who did not object must show improper conduct resulted in *incurable* prejudice.

*Id.* at 709 (alterations in original). Finally, fundamental to the consideration of a claim of prosecutorial misconduct is the principle that

> [a] prosecutor also functions as the representative of the people in a quasi-judicial capacity in a search for justice.
>   Defendants are among the people the prosecutor represents. The prosecutor owes a duty to defendants to see that their rights to a constitutional fair trial are not violated. Thus, a prosecutor must function within boundaries while zealously seeking justice.

*Monday*, 171 Wn.2d at 676 (internal citations and footnote omitted).

The matter before us regards alleged prosecutorial misconduct in the context of voir dire. CrR 6.4(b) provides that voir dire is "conducted for the purpose of discovering any basis for challenge for cause and for the purpose of gaining knowledge to enable an intelligent exercise of peremptory challenges."[3] Specifically, "the parties ask questions and engage in discussion with potential jurors to draw out potential bias," which "is central to securing the right to an impartial jury." *State v. Bell*, 26 Wn. App. 2d 821, 829, 529 P.3d 448, *review denied*, 1 Wn.3d 1035 (2023). However, it is *not* the purpose of voir dire "'to prejudice the jury for or against a particular party [or] to indoctrinate the jury.'" *State*

---

[3] RCW 4.44.120 further provides that a "voir dire examination of the panel shall be conducted for the purpose of discovering any basis for challenge for cause and to permit the intelligent exercise of peremptory challenges."

*v. Frederiksen*, 40 Wn. App. 749, 752, 700 P.2d 369 (1985) (quoting *People v. Williams*, 29 Cal.3d 392, 408, 628 P.2d 869 (1981)).  It follows that a prosecutor who, during voir dire, prejudices the jury against a particular party or indoctrinates the jury is one who functions outside of the boundaries of voir dire and thereby commits misconduct.  *See Monday*, 171 Wn.2d at 676; *Frederiksen*, 40 Wn. App. at 752.

Our Supreme Court's recent examination of prosecutorial misconduct during voir dire, in the context of race-based misconduct, provides additional historical and practical guidance on this issue as follows:

> [W]hat occurs during voir dire is equally as important as what occurs during trial proceedings.  Voir dire is a significant aspect of trial because it allows parties to secure their Sixth Amendment and article I, section 22 right to a fair and impartial jury through juror questioning.  It serves to protect the defendant's right to an impartial jury by exposing possible biases on the part of potential jurors and by selecting a jury capable of deciding and willing to decide the case solely on the evidence.

*Zamora*, 199 Wn.2d at 711-12.  Notably, the court explained that

> *there is an increased danger of infecting the jury with bias and prejudice when the improper conduct occurs at the jury's introduction of the case.*  Voir dire is the potential juror's first introduction to the case, the courtroom, the proceedings, and their responsibility as a member of a jury.  The jury is, in the voir dire phase, primed to view the prosecution through a particular prism.  When the juror pool is tainted by race-based prosecutorial misconduct at the early stages of a case, the jury becomes infected in untraceable ways.

*Id.* at 712 (emphasis added) (citation omitted).  Although Coleman's appeal does not involve race-based misconduct, we keep these general principles in mind as we examine the voir dire conducted by the State at his trial.

2.    Voir Dire

Here, after the prospective jury pool was seated in the courtroom, the trial court introduced itself and explained the role, responsibilities, and importance of being a juror. In doing so, the court remarked that

> [t]he questioning of potential jurors is critical to make sure that the people who are to sit on the jury can do a full and fair job. You may find that some of the questions feel like they pry unnecessarily into your personal life or invade your personal privacy. So if you think any question asked by myself or an attorney is too personal, simply say so. On the other hand, if a question calls for private information and you're willing to give the answer, but you prefer to do so privately and out of the presence of all the other jurors, then simply make that request. The questioning is necessary, but we wish to respect your privacy as well.

Thereafter, following the court's reading of the charges, swearing in of the jury, and conducting its own voir dire, the court turned the questioning over to the State.

The State began its voir dire by briefly inquiring into whether any of the prospective jurors knew one another. After that, the State reiterated the rape of a child, child molestation, and incest charges that had just been read by the judge and asked the jury pool, "So, with that background or fundamental understanding of what this case is about, who here has an issue or a problem or a concern about being a juror in this case dealing with these type [sic] of charges?" Of the forty-eight prospective jurors in the pool, twelve—jurors 5, 12, 18, 20, 26, 30, 31, 34, 37, 39, 41, and 44—raised their numbers in response.

Before undertaking individual examination of those jurors, the prosecutor explained the scope of his intended questioning, stating,

> So essentially if you could tell us your reasons why you have concerns or issues about being a juror in this case, if you had any experience, either yourself, your family members, friends, you know,

- 13 -

anything like that, whatever it is that you have issues with that may be a concern for you as a juror in this case, let us know.

Significantly, nowhere in the transcript, at the beginning of voir dire or later in the process, did the State attempt to remind the prospective jurors of the possibility of individual examination outside the presence of the other members of the jury pool, despite knowing that it would be seeking detailed information not only about the lived experiences relating to sexual abuse of potential jurors themselves, but also those of their "family members, friends, you know, anything like that."

The trial prosecutor started with juror 5 who explained as follows:

> JUROR NO. 5: Yeah, my wife's father was found guilty and convicted seven years for these pretty much very same crimes, molestation. You know, I saw how it just destroyed my wife's family. It brought me to my knees watching her suffer about this. I'd like to say—you know, I got sick even hearing the charges being read. I mean it was hard to even stand up—or sit up straight. I want to be impartial in this. I already think he's guilty. You know, I really do. I mean, with this amount of charges against him, I mean, I said no look—obviously my opinion, it shouldn't have any bearing on anyone else's opinion. Obviously I want that to be the case, but I just don't think I could be impartial in this. I mean, I can't see sitting on this jury and being impartial about anything regarding this.
> [STATE]: Okay. So, are you saying that because of what you went through with your wife and her father that it's too raw, it hits too close to home and that you may evaluate this case not based upon what's going to be presented, but because of your past experience? Is that fair to say?
> JUROR NO. 5: Yes, based upon the visceral action [sic] on even hearing the charges, I think that is exactly the case.

Shortly thereafter, the prosecutor moved on to juror 12 and the examination, in relevant part, proceeded as follows:

> JUROR NO. 12: I've had close family members and friends that have both been molested and had similar things, and then I've also had a close family member that was falsely accused of molestation that wound up taking his own life because of it. And I

just don't know that I can handle seeing both sides of it and being impartial about it.

    [STATE]: Okay.  So just so that I understand, you have had family members and close friends who have been abused?

    JUROR NO. 12: Yes.

    [STATE]: Okay.  And then you have a family or friend who—

    JUROR NO. 12: I had a close family member that was falsely accused and took his own life because of it.

    [STATE]: Okay.  And how do you know that he was falsely accused?

    JUROR NO. 12: Because his accuser came out after he took his own life and said that they were lying about it.

The prosecutor then moved on to juror 18 who disclosed that she had been assaulted as a child by a relative and, after a number of questions about whether she told anyone and when, the State pressed for more detail in the following exchange:

    [STATE]: And how has that affected you going through—

    JUROR NO. 18: Horribly

    [STATE]: Did you have to get counseling, did you have to go to therapy?

    JUROR NO. 18: No.  No.

    [STATE]: Okay.  Were you able to essentially deal with it yourself?

    JUROR NO. 18: Correct.

    [STATE]: Okay.  And you say it was a relative who was the perpetrator, is that correct?

    JUROR NO. 18: Yes.

    [STATE]: Okay.  Did you continue seeing that person?

    JUROR NO. 18: No.

    [STATE]: Okay.  Was that person close to you or your family?

    JUROR NO. 18: Yes.  I think so, yeah.

    [STATE]: And was it one time?

    JUROR NO. 18: No.

    [STATE]: Did it happen over a course of time, is that correct?

    JUROR NO. 18: Yes.

    [STATE]: And how did it end?

    JUROR NO. 18: I moved away.

    [STATE]: I see.  And you said you were a child.  Approximately how old were you?

    JUROR NO. 18: Ten or eleven or twelve.

[STATE]: All right. And then you said you had family members who have gone through the same thing?

JUROR NO. 18: Yes.

[STATE]: Okay. If you don't mind telling us who the family members are, is it close family or extended family or what? Immediate family or extended family?

JUROR NO. 18: Extended.

[STATE]: Okay. And how did that information come out?

JUROR NO. 18: We talked about it.

[STATE]: Okay. So did that person tell or disclose to you and other members of the family or how did that—

JUROR NO. 18: Just to me.

[STATE]: Just to you. Okay. And did the person tell you right away or was there a lag in time or a delay before they told you that?

JUROR NO. 18: It was just a conversation that we had over a period of time that we talked about it. It wasn't right away; it was years later.

[STATE]: Okay. So the incidents happened and then some years later—

JUROR NO. 18: She's not directly related to me.

[STATE]: Gotcha.

JUROR NO. 18: So years after.

[STATE]: Okay. So how old was she when the incident happened to her?

JUROR NO. 18: I believe she was around eight or nine.

[STATE]: Okay. And then years later was when she told you?

JUROR NO. 18: Yes.

[STATE]: Okay. So how did she deal with that situation?

JUROR NO. 18: Same as me.

[STATE]: Okay. Besides telling you, do you know if she told any other people?

JUROR NO. 18: I couldn't say.

[STATE]: Okay. Do you know if it was reported to officials, law enforcement?

JUROR NO. 18: I don't believe so.

In a markedly similar fashion to its questioning of juror 18, after learning of juror 26's history of "pretty significant sexual abuse" and their work "with people who have gone through sexual abuse," the State sought more details about the other people in their life who had been abused. The prosecutor's examination of juror 26 included the following:

- 16 -

[STATE]: Okay. And do you know or do you recall how old they were when it happened and the time between when it happened until when they told everybody or told you?

JUROR NO. 26: Yes. The two that are closest to me, one of them was eighteen and the other was nine.

[STATE]: And they were eighteen and nine when it happened?

JUROR NO. 26: Yes.

[STATE]: Okay. And when did they tell you, how old were they?

JUROR NO. 26: Eighteen-year-old told me this year.

[STATE]: And how much time had elapsed?

JUROR NO. 26: Almost two years.

[STATE]: I'm sorry?

JUROR NO. 26: A little less than two years.

[STATE]: Okay. And then the nine-year-old?

JUROR NO. 26: I believe she's fifteen now and it was just this past year.

[STATE]: So about four or five years?

JUROR NO. 26: Yes.

[STATE]: And do you know if these incidents have been reported to officials for investigation, either CPS or Child Protective Services or law enforcement or, you know, any of those?

JUROR NO. 26: The nine-year-old, yes. The eighteen-year-old, no.

[STATE]: Okay. What's the status of the case involving the nine-year-old?

JUROR NO. 26: The perpetrator was found to be guilty but they were also a minor and it was enough years later that the case was dismissed.

[STATE]: Okay. So the case resolved after it was charged and they went through the process, is that correct?

JUROR NO. 26: Yes.

[STATE]: Okay. And are you still in contact or do you still see the victim?

JUROR NO. 26: Yes.

[STATE]: Okay. And how is he or she doing?

JUROR NO. 26: They're currently going through counseling and a lot of challenges with kind of navigating that with her family.

[STATE]: Okay. So there are consequences that follow based upon those experiences, correct?

JUROR NO. 26: Yes, very much so.

Only after that line of questioning, and before turning to juror 30, did the prosecutor begin to inquire as to juror 26's expressed concern about their ability to decide the case impartially and according to the instructions of the court.

In questioning juror 30, the State again expended significant time and effort to elicit granular facts of abuse experienced by someone in the juror's community before expending a comparably cursory amount of time investigating their ability to be objective in their consideration of the facts of Coleman's case. After being called on by the prosecutor, the following exchange occurred:

> JUROR NO. 30: . . . I'm going through a divorce right now. My wife was sexually molested by her dad when she was a young child and it just made for a difficult life for her and for our marriage.
> [STATE]: So what did she disclose or tell you or tell other people?
> JUROR NO. 30: She told me she was sexually abused, sexually molested by her dad. She never went into the details, so I didn't ask.
> [STATE]: Now, were you the first person she told or do you know if she has told other[s]?
> JUROR NO. 30: She told others.
> [STATE]: Okay. And do you know how old she was when these things happened?
> JUROR NO. 30: I think she was five.
> [STATE]: Okay. And how long did it happen for?
> JUROR NO. 30: I think it lasted until her parents got divorced and she was twelve or so.
> [STATE]: Okay. So a number of years?
> JUROR NO. 30: A number of years.
> [STATE]: From five to about twelve years old. And did she tell anybody at the time or shortly after?
> JUROR NO. 30: I believe she did. I believe she tried to tell her mom and her grandparents.
> [STATE]: Okay. And do you know what happened, what they did?
> JUROR NO. 30: I don't think they believed her or didn't want to believe her.
> [STATE]: So she was still a child at the time, is that correct?
> JUROR NO. 30: Yes. Yes.

[STATE]: And so did she tell you how that affected her, not being, I guess believed or want to be believed by your own mother and parents?

JUROR NO. 30: Yeah, yeah. She's frustrated by that to this day that her mom didn't believe her. She came from a very religious family and so that kind of really frustrated her personally and religiously that they didn't believe her.

[STATE]: Okay. So how does she deal with that situation?

JUROR NO. 30: I think she tried to bury it, but it would come out. I think she dealt with depression most of her life up until this point. I think she's finally started getting counseling.
. . . .

[STATE]: Okay. So and you said you're in the middle of a divorce?

JUROR NO. 30: We're separated and starting the divorce process, yes.

[STATE]: Okay. Does your separation have anything to do with the abuse that your wife—

JUROR NO. 30: Well, the outcome of it, yes. I think the depression, she kind of kept that buried, but I think it would surface every now and then and cause problems and just a lot of other dysfunction.

Then, as it had done with juror 18, after juror 31 described themselves as a "survivor of child abuse," the State explored the details as follows:

JUROR NO. 31: It happened from age five to age eighteen.
[STATE]: Okay. When you say child abuse, can you—
JUROR NO. 31: Molestation.
[STATE]: Okay. And who was the perpetrator?
JUROR NO. 31: My stepfather.
[STATE]: And did you tell anybody at the time that it happened or—
JUROR NO. 31: I didn't tell anybody until I was like sixteen or seventeen, and it was my boyfriend at the time.
[STATE]: Okay. Then what happened?
JUROR NO. 31: When I told him?
[STATE]: Uh-huh.
JUROR NO. 31: Nothing.
[STATE]: Okay. Did you ever tell anybody else besides your boyfriend at the time?
JUROR NO. 31: Eventually it came out because it was happening to two of my sisters as well. And so when he thought that my sister was going to tell, he told. He was a teacher as well too, so that caused a lot of anxiety in the community.

- 19 -

[STATE]: Okay. And then what happened?

JUROR NO. 31: He—it came out to my mom. The authorities got involved. He only got six months in jail for statutory limitations, even though he was molesting a two-year-old.

[STATE]: So did you come forward and tell—

JUROR NO. 31: Yes.

[STATE]: —the officials?

JUROR NO. 31: Yes.

[STATE]: Okay. Did law enforcement get involved then?

JUROR NO. 31: Law enforcement got involved but they couldn't do much because of statutory limitations.

[STATE]: Gotcha. What about CPS, was CPS also involved?

JUROR NO. 31: Oh, I don't—I mean I think they interviewed us.

[STATE]: Okay.

JUROR NO. 31: But I think that was the extent of it.

[STATE]: Okay. What happened to the relationship? When you say the—

JUROR NO. 31: I have a no-contact order for life. There is no relationship. There's a no-contact order with my family for life, and I haven't seen him since it happened.

[STATE]: Okay. So you said that he was your stepfather?

JUROR NO. 31: Correct.

[STATE]: What happened with the relationship between him and your mother?

JUROR NO. 31: I think it was difficult for my mother to separate the person she knew for who he actually was. So it took her a little bit of time to completely cut ties with him, but they're divorced and there's no contact other than per the divorce decree of working out the legal pieces.

[STATE]: All right. So because of his actions involving you and your—is it your sister?

JUROR NO. 31: Two of my sisters, yes.

[STATE]: Two of your sisters. He was cut off, separated, divorced and whatnot from the rest of your family, is that correct?

JUROR NO. 31: Correct.

[STATE]: Okay. How do you feel about the experience going through that?

JUROR NO. 31: It's not a good experience. An experience that you bury, that you don't find yourself in a jury room wanting to tell everyone about it. But I'm going to tell everybody about it because the case hits too close to home for me. I mean, as a child that went through it, it's very hard for me to think that a child is going to make that up, especially with the number of accusations and counts, especially the similarity of it being his daughter and it happened to me.

After briefly speaking with juror 34, who identified themselves as a federal law enforcement officer tasked with "investigating violent crimes against children, specifically child pornography of those that are under the age of twelve," the State moved on to examine juror 37. Juror 37 immediately explained that his wife, "was molested by her half-brother when she was four. Her two sisters that he'd been molesting for years went to their parents and told about it and the family didn't want a scandal so they took it to the Catholic Church and they—." The State interrupted to seek further details:

> [STATE]: They dealt with it?
> JUROR NO. 37: —took care of it in the Catholic Church way.
> [STATE]: They dealt with it?
> JUROR NO. 37: And I think she didn't get molested after that, but I suspect that the half-brother went on. And my wife, if she finds out that I acquitted an accused child molester, she'll probably leave me. So I probably can't be fair.
> [STATE]: So and—
> JUROR NO. 37: And I'm not joking.
> [STATE]: And I don't mean to laugh, but you have that pressure from your wife, and so that possibly is a burden on you at this point, is that correct?

The State next called on juror 39. They indicated that after listening to the "outline of the circumstances and hearing from these two brave women," they had reassessed their answer to the prosecutor's original question about ability to serve.

The State then turned to juror 41 who noted a "visceral reaction" to the case that she attributed to her experience with relatives who had been abused. When the prosecutor asked, "And you said your family members have gone through similar experience? Okay. Do you mind sharing with us?" juror 41 replied, "I'm not willing to share their experience, no." Again, the prosecutor did not remind the

prospective juror of the possibility of individual voir dire, but simply moved on to the final juror of the group that had responded to the initial question about sitting on a case involving child sex offenses.

Juror 44 offered a distinct reason for her reticence about deciding such a case: not only had she encountered abuse in her work as an educator, but she had testified as a witness in a rape case where a family friend was the victim. However, juror 44 also highlighted her concern based on her high-risk pregnancy and the additional stress that would result from serving as a juror. In response, the prosecutor ceased further questions of juror 44 and ceded to defense counsel for his first round of voir dire.

At the start of the defense voir dire, defense counsel immediately reminded the jurors of the possibility of individual voir dire:

> During that discussion, did anyone else feel that they should add their name to that list [of jurors with concerns about deciding a sex abuse case]? Okay. Was there a yes? Anybody?
>      And if your experiences are too personal and you don't want to raise your name [sic], you want to do it in private, we can also do that. Okay. Just let us know that you want to talk to us outside of everyone else here.

Defense counsel also later referenced jury questionnaires and noted that he knew many of their professions, presumably from the answers that they had previously provided on those questionnaires. Significantly, after the venire was excused for a break, the court conducted individual voir dire of juror 15 based on their earlier expression of "an interest or willingness in maybe discussing some things in a more private setting." When the court asked if there was something in particular that juror 15 wanted to discuss or disclose, they answered,

Well, yeah. I wanted to make everyone aware, I didn't want to share in front of everybody because it concerns my daughter. I went through this process with my daughter and her biological father about ten years ago where we went to trial and I did have to testify. He was found not guilty, but I just wanted to make everyone aware of that.

The court elicited further details and, when given the opportunity for his own questioning of the potential juror, the prosecutor declined, though defense counsel engaged in further examination of juror 15.

Of the twelve jurors questioned about their response to the State's question of whether their own experiences, or those of people close to them, impaired their ability to decide a case involving sex offenses, seven were stricken by agreement and one for cause over the State's objection. The court denied the defense challenge to juror 30 for cause.

3. Analysis

The State's questioning of the potential jurors here while in the presence of the entire jury pool constituted misconduct. Although the prosecutor properly sought to explore whether each of the twelve jurors could decide the case based on the evidence presented and the law as provided by the judge "to draw out potential bias," *Bell*, 26 Wn. App. at 829, the prosecutor, with the jury pool in attendance, flagrantly focused on eliciting details about jurors' experiences with sexual abuse. As set forth herein, these details included their experiences, and those of their friends or family members, with disclosing sexual abuse, reporting such abuse to law enforcement, their feelings and trauma resulting from the abuse, as well as the negative aftermath and impact on themselves and their interpersonal

relationships arising from such abuse, including the need for therapy or other assistance. Such questioning in the presence of the jury pool created a significant risk that they would be "primed to view the prosecution through a particular prism," thereby increasing the "danger of infecting the jury with bias and prejudice." *Zamora*, 199 Wn.2d at 711-12.[4]

Contrary to the insinuation of the concurrence,[5] this disparity is plainly evidenced by our exhaustive review of the entire record of voir dire. Notably, the imbalance of questions posed by the State in favor of digging into the details of the jurors' experiences suggests that such questioning was deliberate. As one example, of the thirty-two questions posed to juror 18 by the prosecutor, three largely repetitive questions regarded whether juror 18 believed that they could decide Coleman's case fairly, whereas eighteen of the prosecutor's questions focused on the juror's, and their extended family member's, experience with sexual abuse. This incident, along with the frequency with which this pattern was repeated with the other jurors, all while in the presence of the jury pool, supports our conclusion that the State's questioning herein was flagrant.

The concurrence posits that, with regard to the imbalance of questions posed by the State to the prospective jurors, "it is unclear what that means or where that line is."[6] However, we have long recognized that "[t]he judicial process, to a considerable extent, consists of line drawing." *State v. Serr*, 35 Wn. App. 5, 9, 664

---

[4] Although, as identified by the concurrence, the State on several occasions framed its questioning to the jury pool during voir dire as an inquiry into whether they could remain unbiased despite their past experiences, this otherwise proper framing subsequently evolved into misconduct by the mass of questions interposed by the State delving into subject matter collateral to the case and posing a danger of biasing and prejudicing the jury against Coleman.

[5] Concurrence at 7.

[6] Concurrence at 7.

P.2d 1201 (1983).  As such, we are confident that our analysis herein, resting on well-reasoned caselaw setting forth the well-established standards pertaining to flagrant and ill-intentioned misconduct, sufficiently addresses the concern raised by the concurrence.

Furthermore, a close review of the transcript establishes that the prosecutor's elicitation of such responses in front of the jury venire was ill-intentioned.  As mentioned, when the jury pool was in attendance, the prosecutor moved through questioning the twelve jurors and repeatedly asked follow-up questions in order to extract detailed information about their experiences with sexual abuse.  However, when juror 15 was examined outside the presence of the other jurors and disclosed their experience with child sexual abuse, including testifying in a trial on such allegations, the prosecutor declined to ask a follow-up question.  The prosecutor thus found it unnecessary to conduct a detailed examination when such an inquiry was not occurring in the presence of the other prospective jurors.

This strongly suggests that the prosecutor's voir dire strategy was to examine the traumatic details of one's abuse and aftermath in front of the venire for the purpose of tainting the jury pool against Coleman.  Such tactics plainly constitute ill-intentioned conduct.  In a footnote, the concurrence recognizes our criticism of the State's strategic decision not to utilize individual examination of jurors on these topics and then correctly explains that "there is no authority requiring the State to do so or it commits misconduct."[7]  Nowhere have we

---

[7] Concurrence at 8, n.4.

suggested a per se misconduct rule based on the failure to pursue individual voir dire, but rather have carefully reviewed the entire record of jury selection and noted the marked difference in both the scope and tenor between the questions posed before the jury as a whole and those asked of juror 15 outside the presence of the rest of the venire. The concurrence emphasizes case law that holds a trial court is generally in a better position to evaluate juror responses than a reviewing court.[8] We do not dispute this authority, but rather rely on the body of cases that explicitly authorizes and hones appellate review of purported errors occurring in jury selection. The very existence of cases resulting in reversal on impropriety in the jury selection process establishes that there is, in fact, a jurisprudential line establishing the bounds of that deference. *See State v. Bell*, ___ Wn.3d ___, 571 P.3d 272, 280 (2025) (trial court erred during voir dire by overruling objection to peremptory challenge on the basis of race or ethnicity); *Zamora*, 199 Wn.2d at 723 (prosecutor committed race-based misconduct during voir dire); *State v. Strode*, 167 Wn.2d 222, 231, 217 P.3d 310 (2009) (trial court erred by closing courtroom during voir dire) (plurality opinion); *State v. Lloyd*, 138 Wash. 8, 15, 244 P. 130 (1926) (trial court erred during voir dire by not swearing in the jury pool at the beginning of the defendant's trial); *Stratton v. C.H. Nichols Lumber Co.*, 39 Wash. 323, 331, 81 P. 831 (1905) (misconduct by attorney during voir dire by posing questions to jury assuming alleged facts regarding defendant); *In re Pers. Restraint Petition of Skone*, 30 Wn. App. 2d 1, 543 P.3d 842 (2024), *rev. denied*, 197 Wn.2d 1023 (2021) (prosecutor engaged in misconduct during voir dire by asking

---

[8] Concurrence at 3, 4, 7.

questions intentionally appealing to ethnic bias); *State v. Guevara Diaz*, 11 Wn. App. 2d 843, 861, 456 P.3d 869 (2020), *rev. denied*, 195 Wn.2d 1025 (2020) (trial court erred by seating juror in sexual assault trial who expressed actual bias in jury questionnaire and by not obtaining assurance from juror regarding her impartiality); *State v. Brady*, 116 Wn. App. 143, 148-49, 64 P.3d 1258 (2003), *rev. denied*, 150 Wn.2d 1035 (2004) (trial court abused its discretion by altering planned time for juror questioning during voir dire); *State v. Burch*, 65 Wn. App. 828, 844, 830 P.2d 357 (1992) (misconduct by prosecutor in engaging in purposeful gender discrimination in exercising peremptory challenges); *see also Schwalen v. W.P. Fuller & Co.*, 107 Wash. 476, 477-78, 182 P. 592 (1919) ("A matter presented as was this must be left to the ethics of the profession and the discretion of the trial judge, but where a course of conduct is persisted in apparently with the purpose of prejudicing the jury, the exercise of a wise discretion should call for a ruling which would discontinue such conduct."); *Skone*, 30 Wn. App. 2d at 28, *rev. denied*, 197 Wn.2d 1023 (2021) ("A trial court must preclude irrelevant questioning" during voir dire).

Therefore, on this record, and in light of our Supreme Court's decision in *Zamora*, we hold that the State engaged in prosecutorial misconduct in the manner by which it conducted voir dire and the misconduct was both flagrant and ill-intentioned. 199 Wn.2d at 708-09.[9]

---

[9] The concurrence submits that our Supreme Court in *Zamora* did not intend for the courts of this state to apply its discussion on voir dire principles protecting the right to an impartial jury to contexts outside of race-based misconduct. Concurrence at 11. However, and separate from the fact that its opinion contains no language imposing such limitation of scope, because our state's highest court has instructed that "we must remain wary of how the operation of voir dire may be compromised or prove insufficient in safeguarding a defendant's right to an impartial jury," *Zamora*, 199 Wn.2d at 712 (citing *Peña-Rodriguez v. Colorado*, 580 U.S.206, 137 S. Ct. 855, 869, 197 L.

B.     The State Engaged in Misconduct during Closing Argument

Coleman next asserts that the State engaged in misconduct during closing argument.  Again, we agree.

In addition to the general rules for prosecutorial misconduct set out herein, our Supreme Court has explained that "[a]lthough a prosecutor has wide latitude to argue reasonable inferences from the evidence, [they] must 'seek convictions based only on probative evidence and sound reason.'" *In re Pers. Restraint of Glasmann*, 175 Wn.2d 696, 704, 286 P.3d 673 (2012) (plurality opinion) (quoting *State v. Casteneda-Perez*, 61 Wn. App. 354, 363, 810 P.2d 74 (1991)).  The *Glasmann* court relied on the American Bar Association Standards for Criminal Justice, along with its own precedent, and further explained that the attorney for the State should avoid arguing in a manner "'calculated to inflame the passions or the prejudices of the jury.'" *Id.* (quoting AM. BAR ASS'N, STANDARDS FOR CRIMINAL JUSTICE std. 3-5.8(c) (2d ed. 1980)).

In its initial closing argument to the jury, the State carefully reviewed the charges, special allegations, and highlighted the evidence on which it would rely to prove its case.  Included in that summation was the testimony of forensic interviewer Kristen Mendez, who had met with C. pursuant to the investigation. The State noted that Mendez "explained to [the jury] what delayed disclosure was." However, the prosecutor then immediately stated,

> Obviously, the term 'delayed disclosure,' we talked about a bit during jury selection and how some people in the jury or in the pool had experiences in the past that they either never disclosed or waited for

Ed. 2d 107 (2017)), we respectfully disagree and readily apply these principles to the matter before us.

years to disclose. And so I believe there were at least one or two who said that, yeah, they've never publicly disclosed; they've only told their partners about what had happened. So clearly, logically, disclosing abuse, okay, is a process for the vast majority of people or kids, they don't tell people right away, is because a number of reasons, and Ms. Mendez told you about those.

Apart from the fact that the experiences of members of a jury pool as recounted during voir dire do not constitute testimonial evidence that may be considered in deliberation on criminal charges, this statement was entirely unnecessary; the prosecutor had just reminded the jury that the State's witness, Mendez, had in fact described the phenomenon known as delayed disclosure, along with the "number of reasons" why it might occur. So, in addition to impermissible argument of facts not in evidence, the prosecutor's recall of and explicit reference to the details of the various disclosures of sexual assault during voir dire, not only regarding members of the venire, but also their family, friends, and people that they encountered through their jobs, was an improper emotional appeal to the jury. Invocation of the responses to his own probing questions, which were invasive enough that juror 41 answered, "I'm not willing to share their experience, no," served no other purpose than to refresh the memory of those intimate details disclosed during voir dire and highlight the various trauma and hardship years after the abuse, just prior to jury deliberation.

Again, our case law is clear that such appeals to the passions of the jury are simply impermissible. This reference to voir dire by the trial prosecutor was so clearly improper that during argument before this court, the appellate prosecutor admitted that the State's "closing argument was not great in this situation" and

declared that she was "not going to defend that statement."[10] There does not appear to be any true dispute that this portion of the State's closing argument constituted misconduct.[11]

C.      Coleman Has Not Demonstrated Prejudice from the State's Misconduct

Coleman next asserts that the prosecutor's misconduct prejudiced him such that reversal of his conviction is required. We disagree.

Again, it is Coleman's burden on appeal, where there was no contemporaneous objection in the trial court, to demonstrate that the State's conduct was not only "flagrant and ill intentioned," but to such a degree that it could not have been cured by instruction from the court. *See Glasmann,* 175 Wn.2d at 704. Otherwise, a challenge in waived in the absence of such a showing. *See id.; Loughbom*, 196 Wn.2d at 70*; Thorgerson*, 172 Wn.2d at 443.

Coleman fails to establish that these various instances of misconduct in voir dire and closing argument could not have been cured by instruction from the court. On appeal, he presents an ineffective assistance of counsel claim, raised on the basis that he did not receive effective legal assistance due to his defense counsel's failure to object to the misconduct during voir dire. This argumentation implicitly concedes that such misconduct could have been cured by an instruction following

---

[10] Wash. Ct. of Appeals oral arg., *State v. Coleman,* No. 86629-0-I (Sept. 11, 2024), at 14 min., 10 sec., *video recording by* TVW, Washington State's Public Affairs Network, https://tvw.org/video/division-1-court-of-appeals-2024091200/?eventID=2024091200.
[11] Nevertheless, the prosecutor on appeal asserted that Coleman "hasn't met [his] burden of showing prosecutorial misconduct as a whole, looking at the whole record of the case." *Id*. Insofar as the State admits on appeal that the prosecutor's comments in closing were misconduct, we accept the State's concession. Furthermore, to the extent that the State contends that such misconduct does not constitute reversible error, as discussed *infra* in Section II.C, we agree.

a successful objection.[12]  Accordingly, he has not carried his burden on his claims of prosecutorial misconduct in order to demonstrate entitlement to relief by way of reversal.[13]

The concurrence takes issue with our application of *Zamora*, which examined race-based prosecutorial misconduct in voir dire, to Coleman's assignment of error which is not premised on racialized misconduct because "our Supreme Court has not directed courts to do so."[14]  However, as established *supra* in Section II.A.1, we rely on *Zamora* as the most recent articulation by our Supreme Court of the import of jury selection, the resultant harm that can occur when misconduct occurs at that stage of trial, and for the long-established test for prosecutorial misconduct.  To the extent the concurrence suggests that we have misapplied a review framework for appeals to racial bias, it is simply incorrect.

---

[12] In his opening brief, Coleman relies on *Loughbom* for the proposition that "'repetitive misconduct can have a cumulative effect'" that cannot be cured by instruction.  196 Wn.2d at 77 (internal quotation marks omitted).  However, his assignment of error on appeal regarding ineffective assistance of counsel undermines the premise of this proposition as applicable to him.

[13] Coleman also asserts that the trial court erred by not, sua sponte, interposing itself during the voir dire in question.  In so doing, Coleman relies on decisional authority holding that a trial court has discretion to intercede in the context of a parties' discriminatory use of peremptory challenges under the equal protection clause.  *See State v. Evans*, 100 Wn. App. 757, 763-68, 998 P.2d 373 (2000).  However, while voir dire like that conducted by the State here presents precisely the sort of scenario for which intervention could be beneficial to preserve the fairness of the proceedings, such judicial intervention is discretionary, not mandatory.  Even if we elected to extend that decisional authority to this matter, Coleman does not present adequate analysis of whether the trial court abused its discretion.  Indeed, Coleman does not present us with the considerations to be weighed by the trial court in determining whether to intervene or whether the trial court erred by not doing so.  We do not consider challenges unsupported by argument or authority.  RAP 10.3(a)(6).  Furthermore, as discussed herein, Coleman has not established that the misconduct in question constituted reversible error.  Therefore, Coleman's assertion fails.

We also note that although Coleman relies on one of our Supreme Court's decisions that sets forth the proposition that the trial court may, over the objection of a defendant and his defense counsel, impose an insanity defense on a defendant, we emphasize that our Supreme Court has expressly overruled that decision insofar as it set forth the proposition relied on by Coleman in this matter.  *State v. Smith*, 88 Wn.2d 639, 644, 564 P.2d 1154 (1977), *overruled by State v. Jones*, 99 Wn.2d 735, 740-44, 664 P.2d 1216 (1983).

[14] Concurrence at 10.

Nowhere in our analysis herein have we cited to or applied the additional "flagrant or apparently intentional" test from *Monday*,[15] that the *Zamora* court plainly identified as "a distinct rule that applies to allegations of race-based misconduct." *Zamora*, 199 Wn.2d at 709. The concurrence is correct that our Supreme Court applied that additional analysis to the claims presented in *Zamora*.[16] As painstakingly set out *supra* in Sections II.A.1-3, we have applied only the "'heightened prejudice standard where the defendant must also show that the prosecutor's improper and prejudicial conduct was so 'flagrant and ill intentioned that [a jury] instruction would not have cured the [resulting] prejudice.'" *Zamora*, 199 Wn.2d at 708-09 (alterations in original) (internal quotation marks omitted) (quoting *Loughbom*, 196 Wn.2d at 70). Accordingly, it appears that the only true point of divergence between the majority and our concurring colleague is simply our conclusion that the government's approach to voir dire was misconduct.

III.     Ineffective Assistance of Counsel

As noted *supra* in Part II, Coleman next asserts that he was deprived of the right to effective assistance of counsel on the basis that his attorney failed to object to the prosecutor's misconduct during voir dire. We disagree.

To establish ineffective assistance of counsel, a defendant must show both deficient performance and resulting prejudice. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). Failure to establish either prong of the test ends the inquiry and is fatal to the claim of ineffective assistance

---

[15] 171 Wn.2d at 680.
[16] Concurrence at 2, 9-14.

of counsel. *Id.*; *State v. Hendrickson*, 129 Wn.2d 61, 78, 917 P.2d 563 (1996). The defendant bears the burden of demonstrating both deficient representation and resulting prejudice. *In re Det. of Hatfield*, 191 Wn. App. 378, 401, 362 P.3d 997 (2015).

Deficient performance is that which falls "below an objective standard of reasonableness based on consideration of all the circumstances." *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). An attorney's performance is not deficient if it constitutes a legitimate trial strategy or tactic. *State v. Grier*, 171 Wn.2d 17, 33, 246 P.3d 1260 (2011). Trial counsel's decision about when, and how, to object is a "classic example of trial tactics." *State v. Vazquez*, 198 Wn.2d 239, 248, 494 P.3d 424 (2021).[17]

In considering an ineffective assistance of counsel claim, we engage in a strong presumption that counsel's representation was effective. *McFarland*, 127 Wn.2d at 335. Furthermore, "the presumption of adequate representation is not overcome if there is any 'conceivable legitimate tactic' that can explain counsel's performance." *Hatfield*, 191 Wn. App. at 402 (quoting *State v. Reichenbach*, 153 Wn.2d 126, 130, 101 P.3d 80 (2004)); *see also Grier*, 171 Wn.2d at 33-34; *State v. Kyllo*, 166 Wn.2d 856, 863, 215 P.3d 177 (2009).

Coleman does not overcome the presumption of adequate representation in this matter. Following the strong presumption that counsel's representation was

---

[17] A showing of prejudice requires a reasonable "probability that, 'but for counsel's deficient performance, the outcome of the proceedings would have been different.'" *State v. Estes*, 188 Wn.2d 450, 458, 395 P.3d 1045 (2017) (quoting *State v. Kyllo*, 166 Wn.2d 856, 862, 215 P.3d 177 (2009)). Given our disposition of Coleman's ineffective assistance of counsel claim, we need not address the prejudice prong.

effective, we can conceive of a legitimate tactic that explains his defense attorney's decision to not object to the prosecutor's questioning during voir dire. For instance, effective defense counsel could view such questioning as having a very high likelihood of exposing jurors who might be biased against Coleman's defense at trial. Additionally, effective defense counsel could determine that such questioning might have the effect of predisposing the jury against the State's argument in light of the discomfort of listening, or responding, to the prosecutor's repeated prying into not only the details of multiple jurors' traumatic experiences with sexual assault, but also the specifics of such jurors' friends and family. In the context of this particular record, we can conceive that defense counsel here might have elected to not object to the State's line of questioning in order to enable the prosecutor to reveal potential juror bias against the defendant while simultaneously allowing the prosecutor, rather than himself, to dig into the jury pool members' intimate and emotional experiences with sexual abuse. These are legitimate tactics for effective defense counsel to employ.

Furthermore, the transcript from voir dire suggests that defense counsel was relying on precisely such tactics. For instance, after the prosecutor had questioned eight of the twelve prospective jurors who had raised their hand in response to the State's question regarding whether they had issues with the subject matter of the trial, the following exchange occurred:

> THE COURT: And let's try to wrap up if we can, [prosecutor]. I'll give you some rebuttal time, but—
> [DEFENSE COUNSEL]: *Your Honor, he has four more that raised their hand. Would he be able to finish that before I start?*
> THE COURT: You might as well finish this line since we're on that trial [sic].

> [DEFENSE COUNSEL]: Okay. Thank you, Your Honor.
> [PROSECUTOR]: Thank you.

The prosecutor thereafter finished his voir dire of the four jurors in question. Shortly after defense counsel began his voir dire, he told the jury pool, as quoted *supra* in Section II.A.2, "if your experiences are too personal and you don't want to raise your name [sic], you want to do it in private, we can also do that. Okay. Just let us know that you want to talk to us outside of everyone else here."

These excerpts suggest that defense counsel was employing a strategy of utilizing the prosecutor to uncover juror bias; benefiting from the results of letting opposing counsel do the uncomfortable questioning. Furthermore, the foregoing also suggests that Coleman's legal counsel was enabling the prosecutor to continue inquiring into the personal experiences of members of the juror pool in front of the other jury pool members while presenting himself as more sympathetic, offering them the opportunity to discuss such matters in a more private setting. Given that, not only can we conceive of legitimate trial strategy based on defense counsel's conduct in this matter, the record also reflects that Coleman's attorney was actively engaging in such tactics.[18] Therefore, for the foregoing reasons, Coleman does not establish that his legal counsel's performance was deficient. Accordingly, his ineffective assistance of counsel claim fails.

IV.     Exclusion of Coleman's Testimony

Coleman next asserts that the trial court erred when it excluded a portion of his testimony on direct examination. Because Coleman's legal counsel did not

---

[18] In addition, such tactics were effective. None of the twelve prospective jurors questioned by the prosecutor in this manner were empaneled on the jury.

present an adequate offer of proof to the trial court in response to the judge sustaining the State's objection and, more critically, because he instead expressly elected to abandon the line of questioning at issue, Coleman has waived this assignment of error.

ER 103(a) provides, in pertinent part, as follows:

Effect of Erroneous Ruling. Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and

. . . .
(2) *Offer of Proof*. In case the ruling is one excluding evidence, the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked.

(Boldface omitted.) Our Supreme Court has instructed that when a party that does not make an adequate offer of proof regarding testimony excluded in the trial court, the party has not sufficiently preserved the issue for appellate review. *See, e.g., State v. Riker*, 123 Wn.2d 351, 370, 869 P.2d 43 (1994) (finding issue not preserved for review when no offer of proof made on excluded testimony); *State v. Benn*, 161 Wn.2d 256, 269, 165 P.3d 1232 (2007) (holding court of appeals did not err by concluding it could not determine whether trial court had erred in absence of offer of proof by defendant (citing ER 103(a)(2)); *State v. Denton*, 58 Wn. App. 251, 257, 792 P.2d 537 (1990) ("[I]n the absence of an offer of proof, no error can be found.").

Here, Coleman testified in his own defense during his case in chief. On direct examination, the following exchange occurred:

[DEFENSE COUNSEL:] . . . After those two visits [to your house,] did [C.] make known to you her feelings about the parenting plan?
[COLEMAN:] She did.

- 36 -

[DEFENSE COUNSEL:] Okay. And was [C.] in agreement with the parenting plan?

[COLEMAN:] Yes, she was.

[DEFENSE COUNSEL:] She was fine with how much time she spent at both houses?

[COLEMAN:] No. She was fine with being at my house.

[DEFENSE COUNSEL:] Okay. Do you think that she wanted to spend time at your house?

[PROSECUTOR]: Objection. One, it calls for hearsay. Number two, speculation.

[DEFENSE COUNSEL]: It's not offered for the truth. It's offered for her [sic] perspective on what [C.] was wanting.

THE COURT: The question is whether did she want, so that's a state of mind that would belong to her. *I'm going to sustain the objection.*

[DEFENSE COUNSEL]: Okay.

By [DEFENSE COUNSEL]:

Q. Did [C.] say to you that she wanted to spend more time at your residence?

[PROSECUTOR]: Objection; hearsay.

THE COURT: *Sustained.*

[DEFENSE COUNSEL]: Not offered for the truth, Your Honor.

THE COURT: Well, what else is it offered for then, for what purpose?

[DEFENSE COUNSEL]: It's offered for the purpose of—sorry, *let me just move on, Your Honor.*

THE COURT: *Withdraw?*

[DEFENSE COUNSEL]*: Withdraw.*

THE COURT: *Okay.*

Defense counsel did not request to make an offer of proof outside of the presence of the jury. Instead, he expressly withdrew the question and argument against the State's objection, and moved on to a different line of questioning.

Coleman does not present an adequate record for our review on appeal. The record does not contain an offer of proof informing the trial court, or this court, about the substance of Coleman's anticipated testimony in response to the two questions posed by his attorney. This is significant because such an offer of proof might have also informed the trial court, or this court, whether the foregoing

questions constituted the entirety of defense counsel's line of questioning on this topic or whether he would have presented additional evidence based on Coleman's responses.

The record here does not contain adequate legal argument or authority as to the admissibility of such testimony or evidence. Instead, the record reflects that Coleman's counsel requested that the court permit him to "move on" from the disputed line of questioning, which the court granted, and Coleman did. In so doing, Coleman's legal counsel elected to abandon the questioning at issue. Accordingly, the issue has not been adequately preserved for review and we decline to consider it further.[19]

V.      Issuance of Noncorroboration Instruction

Finally, Coleman asserts that the trial court erred when it instructed the jury that the testimony of the alleged child victim need not be corroborated. This is so, Coleman contends, because such an instruction constitutes an improper comment on the evidence.[20] Adhering to binding precedent, we disagree.

Our state constitution provides, "Judges shall not charge juries with respect to matters of fact, nor comment thereon, but shall declare the law." WASH. CONST. art. IV, § 16. However, an "instruction does not constitute an impermissible comment on the evidence when there is sufficient evidence in the record to support it and when the instruction is an accurate statement of the law." *State v. Hughes*,

---

[19] By way of his appellate briefing, Coleman endeavors to present the offer of proof not provided to the trial court in this matter. Coleman's presentations at this stage of his case are unavailing.

[20] This instruction in question is commonly referred to as a "noncorroboration instruction" or "no corroboration instruction."

106 Wn.2d 176, 193, 721 P.2d 902 (1986).[21]

Here, the challenged instruction, "Instruction No. 8," stated,

In order to convict a person of the crime of Rape of a Child in the First Degree, Child Molestation in the First Degree, or Incest in the Second Degree as defined in these instructions, it is not necessary that the testimony of the alleged victim be corroborated.

Coleman's attorney objected to the issuance of this instruction during a colloquy on jury instructions. On appeal, Coleman asserts that the foregoing instruction "is a disfavored instruction and should not be given." Insofar as Coleman's assertion applies to our binding precedent, he is mistaken. We recently upheld an identical instruction in *State v. Zwald*, 32 Wn. App. 2d 62, 555 P.3d 467 (2024), *review denied*, 4 Wn.3d 1005 (2025). In doing so, we stated that "[f]or decades, trial courts have been asked to instruct juries in sex cases that the law does not require corroboration of an alleged victim's testimony."[22] *Id.* at 70.[23] Indeed, Coleman concedes this point on appeal, stating that the "trial court's instruction to the jury # 8 is a 'correct statement of the law'" as "our Appellate Court's [sic] have uniformly upheld use of the instruction."[24] In this light, Coleman has not demonstrated that the trial court erred in giving the instruction and, accordingly, does not establish an entitlement to appellate relief.

---

[21] "We review challenged jury instructions de novo, examining the effect of a particular phrase in an instruction by considering the instructions as a whole and reading the challenged portions in the context of all the instructions given." *State v. Harris*, 164 Wn. App. 377, 383, 263 P.3d 1276 (2011).

[22] The instruction in *Zwald* also provided, in pertinent part, that "it is not necessary that the testimony of the alleged victim be corroborated." 32 Wn. App. 2d at 68.

[23] *See also Zwald*, 32 Wn. App. 2d at 70-72 (discussing *State v. Clayton*, 32 Wn.2d 571, 574-75 202 P.2d 922 (1949)); *State v. Chenoweth*, 188 Wn. App. 521, 535, 354 P.3d 13 (2015); *State v. Zimmerman*, 130 Wn. App. 170, 183, 121 P.3d 1216 (2005), *remanded on other grounds*, 157 Wn.2d 1012, 138 P.3d 113 (2006).

[24] Coleman also does not challenge the noncorroboration instruction on the basis of evidentiary insufficiency.

VI.    Cumulative Error

Finally, Coleman asserts that reversal is required due to cumulative error, premised on his belief that errors occurred at every stage of his trial. We disagree.

The cumulative error doctrine applies in "instances when there have been several trial errors that standing alone may not be sufficient to justify reversal but when combined may deny a defendant a fair trial." *State v. Greiff*, 141 Wn.2d 910, 929, 10 P.3d 390 (2000). For reversal to be justified, a defendant must establish that multiple accrued errors rendered the defendant's trial "fundamentally unfair." *Emery*, 174 Wn.2d at 766.

As discussed herein, we identified error with regard to misconduct by the prosecutor during voir dire and in closing, but concluded that such error did not prejudice Coleman. Because we there was no error with regard to the effectiveness of Coleman's legal counsel, the trial court's exclusion of his testimony, or the court's issuance of a noncorroboration instruction to the jury, Coleman has not established that multiple errors occurred at every stage of his trial rendering his criminal "fundamentally unfair." *Id.* Accordingly, Coleman does not establish an entitlement to appellate relief on this basis.

Affirmed.

_____

I CONCUR:

_____
Mann, J.

- 40 -

No. 86629-0-I <u>State of Washington v. Danny Coleman Jr.</u>

DíAZ, J. (concurring) — I agree with my esteemed colleagues in the majority on every issue in this matter, except as to one of Coleman's two claims of prosecutorial misconduct.  On both, I concur with the majority that any misconduct which may have occurred during trial does not mandate reversal.  Majority at 9.

As to the first claim, I agree with the majority that the State, as it concedes, committed prosecutorial misconduct during its closing argument by referring to statements jurors made during voir dire.  *Id.* at 28-30 & nn.10-11 (explaining the concession).  But I also agree that Coleman fails to show that that misconduct could not have been cured by an instruction from the court, dooming that claim.  *Id.* at 30-31.

I write separately only on the second claim because I respectfully disagree with the majority's conclusion that the State committed misconduct—let alone flagrant and ill intentioned misconduct—during voir dire. *Id.* at 23, 27.

The disagreement revolves around whether the State's conduct was so contrary to the methods and goals of voir dire—which includes "ask[ing] questions and engag[ing] in discussion with potential jurors to draw out potential bias"—that Coleman met that "much higher bar" for reversal than had he timely objected.  *State v. Bell*, 26 Wn. App. 2d 821, 829, 529 P.3d 448 (2023); CrR 6.4(b) ("the purpose of [voir dire is to] discover[] any basis for challenge for cause and for the purpose of gaining knowledge to enable an intelligent exercise of peremptory challenges"); *State v. Loughbom*, 196 Wn.2d 64, 74, 470 P.3d 499 (2020) (requiring a defendant show flagrant and ill intentioned misconduct that is incurable if his counsel did not object to the misconduct at trial).

The majority concludes that the record "strongly suggests that the prosecutor's voir dire strategy was to examine the traumatic details of one's abuse and aftermath in front

1

of the venire for the purpose of tainting the jury pool against Coleman." Majority at 25.

Respectfully, I disagree both on the facts and on the law. As to the facts, I believe that the majority presents an accurate but incomplete picture of the State's conduct during voir dire. I believe the State's questions on the whole were not contrary to a proper goal of voir dire—to draw out bias—particularly because the State repeatedly reminded the potential jurors of that goal, and of the State's evidentiary burden irrespective of the content of the discussion. As to the law, I respectfully submit that, even if there was some misconduct, there is no showing that it rose to flagrant and ill intentioned misconduct and, importantly, that the majority's holding represents the first time a court has applied the remedial measures announced in, e.g., *State v. Zamora*, 199 Wn.2d 698, 512 P.3d 512 (2022), to putative misconduct during voir dire outside of a race-based context.

Ultimately, I worry that future parties' attempts to draw out potential bias in a venire will be unnecessarily chilled because the majority does not define or describe the "limits" for inquiring into prospective jurors' past experiences, lest they "taint" the pool. Majority at 9, 12, 27. For these reasons, I respectfully write separately, while concurring in the result.

I.      ANALYSIS

A.      Disagreement as to the Facts

1. Supplemental Principles When Reviewing Misconduct Claims in Voir Dire

Any prosecutorial misconduct claims must be judged "in the context of the *entire record* and the circumstances at trial." *State v. Azevedo*, 31 Wn. App. 2d 70, 78, 547 P.3d 287 (2024) (emphasis added); *State v. Monday*, 171 Wn.2d 667, 675, 257 P.3d 551 (2011) (holding that "this has been the standard in this state for at least 40 years" that,

"[i]nstead of examining improper conduct in isolation, we . . . examin[e] that conduct in the *full trial context*," including "the evidence presented" and "'the context of the total argument.'") (emphasis added) (quoting *State v. McKenzie*, 157 Wn.2d 44, 52, 134 P.3d 221 (2006)). The Court in *Monday* also held that "a defendant's failure to object to a prosecutor's remarks when they are made 'strongly suggests' that the remark did not appear critically prejudicial in the trial's context." 171 Wn.2d at 679 (quoting *State v. Swan*, 114 Wn.2d 613, 661, 790 P.2d 610 (1990)).

When evaluating jury selection in particular, our Supreme Court has held that "voir dire should be conducted in a manner that encourages potential jurors to speak up" and should include "*explor[ing] options for follow-up questioning* beyond merely asking the juror if they can set their feelings aside and try the case fairly." *State v. Lupastean*, 200 Wn.2d 26, 57, 513 P.3d 781 (2022) (noting also that "many people would likely be uncomfortable admitting to a judge and a group of strangers from the local community that they cannot be fair") (emphasis added).

This court has "emphasized" in a related context that "the trial court is in the best position to evaluate whether a juror must be dismissed" as "[o]ur review is limited to a [juror]'s transcribed voir dire answers" and we "are unable to assess [their] nonverbal reactions," *including* those to "other jurors' voir dire answers." *State v. Lawler*, 194 Wn. App. 275, 287, 374 P.3d 278 (2016).

In short, we must look to the entire proceeding, with an expectation that jury selection is designed precisely to delve into a venireperson's views, and with the understanding that we are merely reading a "cold record." *State v. Gosser*, 33 Wn. App. 428, 434, 656 P.2d 514 (1982) ("The trial court's personal observation of [a juror's]

demeanor in answering the questions [during jury selection] places it in a better position to evaluate and interpret the response than we can from reading the cold record.").

2. The State's Questioning

As the majority accurately recounts, the State sequentially questioned 12 "prospective jurors in the pool . . . Jurors 5, 12, 18, 20, 26, 30, 31, 34, 37, 39, 41, and 44," who had raised their numbers when asked if they "'ha[d] an issue or a problem or a concern about being a juror in this case dealing with these type of charges [involving rape of a child, child molestation and incest]?'" Majority at 12-13 (quoting 1 Rep. of Proc. (RP) at 19, 33-34). It is also true that the State then explained it wanted to know "'why'" they had such issues or concerns, particularly "'if [they] had any experience, either yourself, your family members, friends.'" Id. at 13 (quoting 1 RP at 34).

As a preliminary matter, this question is clearly relevant and aligns with a proper method of voir dire, namely, to ask "follow-up question[s] beyond merely asking the juror if they can set their feelings aside and try the case fairly." Lupastean, 200 Wn.2d at 57. The State effectively asked how the abuse affected the jurors either directly or through their family and friends. I do not believe my friends in the majority and I disagree that some follow-up questions are permissible—e.g., to explore the circumstances and depth of the effect on the past victims of any such abuse—as it would (1) inform the parties and court whether a particular juror can remain impartial and (2) allow the parties to gain knowledge to enable an intelligent exercise of peremptory challenges. CrR 6.4(b). The question is the degree to which a party may explore such "issues or concerns."

To answer that question, it is also relevant that the State did more than just solicit information from each individual juror. The State also repeatedly reminded each juror—

4

and, thus, the jury pool as a whole—that the State was asking such questions to draw out potential biases and that it bore the burden of proof during the testimonial portion of the trial, regardless of the answers given during voir dire. *Bell*, 26 Wn. App. 2d at 829.

For example, when the State questioned juror 5, it asked the juror whether their experience "hits too close to home," such that they "may evaluate this case, not based upon what's going to be presented, but because of [their] past experience?" Only later did the State then ask if they felt "that [they could] be fair and impartial to either side in this case?"[1]

Similarly, when the State questioned juror 26, it explained:

And if we were to excuse everybody because it's uncomfortable, you know, it's icky and, you know, unless there's, you know, real valid reasons why you can't be a juror, then I would have an empty courtroom. Right? So that's not the test, if you will.

The test is . . . whether or not you can be a juror in this case and *listen to the testimony and look at the evidence*, and then the judge will give you instructions, which is the law that controls this case, and then *decide whether or not the State has proved the case based upon the evidence and testimony has to be presented*. Okay? So that is, I guess in a nutshell, the outline.

(Emphasis added.)

As a further example, the State told juror 30:

[W]e have to be able to gauge, if . . ., for example, you're adamant, similar to Juror No. 5, that it's too raw, then obviously that is a concern. But if you have the ability to *set aside your experience*, not ignore or forget about it, but set aside and understand that if you're a juror in this case you're to *evaluate the evidence in this case*, the charges in this case against this

---

[1] Juror 5 responded that he could not be fair and impartial because he "already [thought Coleman was] guilty." But juror 5 immediately then qualified this statement by stating, "obviously my opinion, it shouldn't have any bearing on anyone else's opinion." Such a statement, made sua sponte, should be viewed as partially mitigating any "taint" one person's experience and opinion could have on other potential jurors.

defendant, *not the person or whoever that did this to your wife or your family mother* [sic]. Okay. So that's what we're trying to figure out.

(Emphasis added.)

And as a final example, the State paused when questioning juror 41 to explain:

Now, like I've already said before, the standard in this courtroom, in a criminal case, is *proof beyond a reasonable doubt*, which means that *the prosecution has to provide enough evidence* through testimony otherwise to overcome that burden. Okay. So at this point, like I said, you only know what the charges are and the relationship between the defendant and the alleged victim. *You haven't heard any testimony, you haven't seen any evidence or anything like that*. Okay. Are you saying that just at this point, just based upon what you know, you cannot be a juror because you've already made up your mind or you're too biased or whatever. Is that correct?

(Emphasis added.)[2]

Moreover, the State's admonitions were not lost on the juror pool. Several prospective jurors asserted sua sponte, i.e., without any prodding by the State, that they could or could not be impartial, which reflected that they understood that that was the goal of the process, not indoctrination. In fact, one juror (12), indicated they could not be impartial, not only because of the abuse family and friends had suffered, but because they had a "close family member that was falsely accused and took his own life because of it." In other words, the jurors' attempts to assess their own impartiality cut both ways, i.e., weeding out jurors who were biased in favor of conviction or of dismissal.

In short, the State repeatedly framed its inquiry on whether prospective jurors could "be logical and analytical and focus on what's presented here in this courtroom, the four points of this courtroom, *rather than [their] past experience*[.]" (Emphasis added.) Viewing the "entire record" as we must, I respectfully disagree with my valued colleagues

---

[2] These types of questions or statements were not limited to these jurors.

in the majority that the State "focused on eliciting details about jurors' experiences with sexual abuse" or struck an "imbalance of questions . . . in favor of digging into the details of the jurors' experiences." Majority at 23-24.[3] The record shows that the State's goal was not to taint the jury with horrific tales of sexual abuse in the hope they would be biased in the State's favor, but to select an impartial jury, a fact the jurors themselves acknowledged repeatedly.

Even if there was some "imbalance"—though it is unclear what that means or where that line is—or if the State's questioning "wasn't the most trauma informed way to ask those sorts of questions," as the State stated at oral argument, Wash. Ct. of Appeals oral argument, *State v. Coleman*, No. 86629-0-I (Sept. 11, 2024), at 12 min., 52 sec. through 13 min., 01 sec., *video recording by* TVW, Washington State's Public Affairs Network, https://tvw.org/video/division-1-court-of-appeals-2024091200, our Supreme Court has held that the presiding "trial judge is afforded *considerable discretion* in determining *how many questions* the parties may ask and *how the questions should be worded*." *In re Pers. Restraint of Lord*, 123 Wn.2d 296, 308, 868 P.2d 835 (1994) (emphasis added). This deference is also consistent with this court's caution in assessing the "cold record." *Gosser*, 33 Wn. App. at 434. Together, I would respectfully submit that a trial court is in a better position to determine if there was any imbalance and it is telling that there was no indication of any discomfort the State had "gone too far" either from the

---

[3] Coleman makes this claim more sweepingly, stating that the "overwhelming majority of the 38 pages of transcript of [the State's] voir dire relate to the horrors of child sex abuse and the effect it has on the victims and the community, and the alleged victim in this case." That is simply not true, when we view the State's questioning in the context of the "entire record," as we must. *Azevedo*, 31 Wn. App. 2d at 78. And there is no reference in voir dire at all about the effect sexual abuse has on the "community" or had on the "alleged victim."

court or defense counsel.[4]

In response, Coleman cites to *State v. Allen*, where our Supreme Court held "'correctly stating the law *once* hardly can compensate for misstating the law multiple other times.'" 182 Wn.2d 364, 377, 341 P.3d 268 (2015) (emphasis added) (quoting *State v. Allen*, 178 Wn. App. 893, 925, 317 P.3d 494 (2014) (J. Maxa dissenting in part), *rev'd Allen*, 182 Wn.2d at 387).

Here, in contrast to *Allen*, Coleman points to no relevant misstatement of the law and the State did not just correctly state the law "once," but did so repeatedly and thoroughly to remind the jury of the importance of impartiality and the legal protections afforded to Coleman as a criminal defendant. *See Lord*, 123 Wn.2d at 308 (noting approvingly how the venire was "repeatedly informed, during the voir dire process, of the State's burden.").

Finally, I note that eight of the twelve jurors questioned were excused. 1 RP at 112-15 (Jurors 5, 12, 18, 26, 31, 37, 41, 44). And the court declined to excuse juror 30 and 32—which Coleman does not assign error to—and neither party moved to excuse jurors 34 or 39. The majority acknowledges that "[n]one of the prospective twelve jurors questioned by the prosecutor in this matter were empaneled on the jury." Majority at 35

---

[4] The majority also appears to criticize the State because it did not offer "the possibility of individual examination outside of the presence of the jury pool." Majority at 3, 14, 22. But there is no authority requiring the State to do so or it commits misconduct. More importantly, immediately prior to the State's questioning, the court expressly informed the prospective jurors that they could either request questioning "privately and out of the presence of all the other jurors" for any reason or decline to answer any question they felt was "too personal." Coleman's counsel did not request such individual questioning at any point in the process. But, juror 15 did avail themselves of private questioning and still stated, despite the alleged taint, that they could be fair as they would "rather have [a defendant] go free just in case then to send him away if nothing had happened."

n.18 (citing 1 RP at 19, 34, 121). In this way, the parties' conduct during voir dire served its purpose of "enabl[ing] an intelligent exercise of peremptory challenges." CrR 6.4(b).

Thus, when viewing the full context of voir dire, I conclude the State did not commit misconduct during voir dire at all.

B.      Disagreement on the Conclusions of Law Flowing from these Facts

"Where prosecutorial misconduct is claimed, the defense bears the burden of establishing the impropriety of the prosecuting attorney's comments and their prejudicial effect." *State v. Brown*, 132 Wn.2d 529, 561, 940 P.2d 546 (1997). "Allegations of prosecutorial misconduct are reviewed under an abuse of discretion standard." *State v. Molina*, 16 Wn. App. 2d 908, 918, 485 P.3d 963 (2021). "It is well settled that voir dire, of necessity, is left to a trial court's 'sound discretion.'" *State v. Wade*, 28 Wn. App. 2d 100, 111, 534 P.3d 1221 (2023) (internal quotation marks omitted) (quoting *State v. Davis*, 141 Wn.2d 798, 825, 10 P.3d 977 (2000)). For these reasons, even where defense counsel objects, "a trial court's ruling regarding voir dire *rarely will be disturbed on appeal*." *State v. McKnight*, 25 Wn. App. 2d 142, 150, 522 P.3d 1013 (2023) (emphasis added).

But whether the State committed an improper act or simple misconduct, or whether the trial court abused its sound discretion is not the test here. As the majority again accurately notes, Majority at 11, Coleman failed to object below and thus waived the "error unless the [conduct] is so flagrant and ill-intentioned that it causes an enduring and resulting prejudice that could not have been neutralized by a curative instruction to the jury." *Brown*, 132 Wn.2d at 561. "This standard sets a *much higher* bar for reversal than the 'improper and prejudicial' standard we employ when a defendant timely objects." *Loughbom*, 196 Wn.2d at 74 (emphasis added). The "difficulty of proving flagrant and ill

9

intentioned misconduct emphasizes the magnitude of defense counsel's responsibility to protect their clients' right to a fair trial and the consequences for their clients when counsel fails to act." *Id.*

The majority holds that this matter presents the rare case of meeting that much higher bar by relying on "general principles" addressing the unique role of a prosecutor and our "Supreme Court's recent examination of prosecutorial misconduct during voir dire, in the context of race-based misconduct," particularly *Zamora*, which they claim provides "additional historical and practical guidance." Majority at 9-10, 12, 27. Specifically, the majority asserts that the State "flagrantly focused on eliciting details about jurors' experiences with sexual abuse" and, as in *Zamora*, thereby "created a significant risk that [the jury pool] would be 'primed to view the prosecution through a particular prism'" and "increas[ed] the 'danger of infecting the jury with bias and prejudice.'" *Id.* at 23-24 (quoting 199 Wn.2d at 711-12).[5]

I believe that such a holding represents the first time a court has applied such principles to putative misconduct during voir dire outside a race-based context, and I respectfully submit that our Supreme Court has not directed courts to do so.

Our Supreme Court's recent examination of prosecutorial misconduct during voir dire is expressly based on the unique challenges and risks associated with race-based misconduct. In *Monday*, the Court held that "'arguments based upon *racial, ethnic and*

---

[5] My esteemed colleagues in the majority also claim that *Monday* stands for the proposition that "a prosecutor who, during voir dire, prejudices the jury against a particular party or indoctrinates the jury is one who functions outside of the boundaries of voir dire and thereby commits misconduct." Majority at 12 (citing *Monday*, 171 Wn.2d at 676). Respectfully, I do not believe that seminal case stands for that proposition, as that case did not involve voir dire, and is silent on "indoctrinating" the jury at that stage.

*most other stereotypes* are antithetical to and impermissible in a fair and impartial trial"

and—in rejecting that the defendant there still bore the burden of showing a substantial

likelihood that the misconduct affected the verdict—it established a new "appropriate

standard[]"—i.e., constitutional harmless error—"to deter" a prosecutor who "appeals to

*racial* bias" and who thereby "necessarily seek[s] to single out one *racial* minority for

different treatment." 171 Wn.2d at 678-80 (emphasis added) (quoting *State v. Dhaliwal*,

150 Wn.2d 559, 583, 79 P.3d 432 (2003) (Chambers, J., concurring)).

Similarly, in *Zamora*, the Court held that, "while '[a]ll forms of improper bias pose

challenges to the trial process[,] . . . there is a sound basis to treat *racial* bias with *added*

*precaution*.'" 199 Wn.2d at 709 (second emphasis added) (alterations in original) (quoting

*Peña-Rodriguez v. Colorado*, 580 U.S. 206, 225, 137 S. Ct. 855, 197 L. Ed. 2d 107

(2017)). The Court further held that such precaution is appropriate "[w]hen the juror pool

is tainted by *raced-based prosecutorial misconduct* at the early stages of a case." *Id.* at

712.

In other words, it is still true that our Supreme Court has "found prosecutorial

misconduct to be flagrant and ill intentioned in a narrow set of cases where we were

concerned about the jury drawing improper inferences from the evidence, such as those

comments alluding to *race* or *a defendant's membership in a particular group*, or where

the prosecutor otherwise comments on the evidence in an inflammatory manner." *In re*

*Pers. Restraint of Phelps*, 190 Wn.2d 155, 170, 410 P.3d 1142 (2018) (emphasis added).[6]

---

[6] As to the latter, the Court in *Phelps* cited *State v. Belgarde*, 110 Wn.2d 504, 508, 755 P.2d 174 (1988)—holding a prosecutor committed flagrant and ill-intentioned misconduct by telling the jury the defendant in a murder trial was " 'strong' " with the American Indian Movement (AIM) and calling AIM a "'deadly group of madmen'" and "'butchers that kill indiscriminately'"—and *In re Pers. Restraint of Glasmann*, 175 Wn.2d 696, 701-02, 286

Moreover, because of the unique history and challenges of eradicating race-based misconduct, our Supreme Court has also expressly declined to extend this "added," new, or heightened test for race-based misconduct to other prosecutorial misconduct claims. *State v. Emery*, 174 Wn.2d 741, 758, 278 P.3d 653 (2012) (declining to apply the standard from *Monday* as "this case does not involve the apparently deliberate injection of racial bias"); *Zamora*, 199 Wn.2d at 709 (holding that, "[w]hen the allegation is that the prosecutor's misconduct implicated racial bias, *we apply a separate analysis*" and describing *Monday* as creating a "*distinct rule* that applies to allegations of race-based prosecutorial misconduct") (emphasis added).

I respectfully believe that our Supreme Court's historic rulings on race-based misconduct are not meant to apply to all claims of possible misconduct or to the present matter, which lacks any allegation of race-based misconduct. At a minimum, there is no authority I have located extending *Monday* or *Zamora* to a case "focus[ing] on eliciting details about jurors' experiences with sexual abuse." Majority at 23. And there is no authority holding, as the majority does, that "imbalanced" questioning, or questioning differently before the whole panel as opposed to individually, may rise to the level of flagrant, deliberate, or ill intentioned misconduct found in *Monday* or *Zamora*. *Id.* at 24-25 & 25.[7]

---

P.3d 673 (2012)—holding it was flagrant and ill-intentioned misconduct for a prosecutor to present slides of the defendant's booking photograph with words like "'GUILTY'" and "'WHY SHOULD YOU BELIEVE ANYTHING HE SAYS ABOUT THE ASSAULT?'" superimposed over the photograph in bold red letters. The claim here does not rely on such "inflammatory" comments on the evidence, as the misconduct allegedly occurred prior to the testimonial phase of the trial.

[7] Our Supreme Court's opinions in *Loughbom* and *State v. Thorgerson*, 172 Wn.2d 438, 258 P.3d 43 (2011), also referenced by the majority, at 9, also did not involve voir dire.

It is true, as the majority references, at 11-12, that this court 40 years ago in *State v. Frederiksen* held that it is improper to "'educate the jury panel to the particular facts of the case,'" "'to prejudice the jury for or against a particular party,'" or "'to indoctrinate the jury'" during voir dire. 40 Wn. App. 749, 752, 700 P.2d 369 (1985) (quoting *People v. Williams*, 29 Cal.3d 392, 408, 628 P.2d 869, 174 Cal. Rptr. 317, 325 (1981). And the authority upon which *Fredericksen* relied also held that "a question may be excluded if it appears intended *solely* to accomplish such improper purpose." *Williams*, 29 Cal.3d at 408 (emphasis added). But that court also held that a trial court "cannot exclude questions proper in scope" and that "a question fairly phrased and legitimately directed at obtaining knowledge for the intelligent exercise of peremptory challenges may not be excluded merely because of *its additional tendency* to indoctrinate or educate the jury." *Id.* (emphasis added). Thus, while *Frederiksen* lays out a general standard, the authority it relies on presents a more nuanced approach.

Finally, even if there was any misconduct that rose to the "level of severity our precedent suggests is necessary to meet the 'flagrant and ill intentioned'" standard, *Phelps*, 190 Wn.2d at 171, I agree with the majority that Coleman has failed to show that such misconduct was not curable, "because even flagrant misconduct can be cured." *Emery*, 174 Wn.2d at 762 n.13; *State v. Negrete*, 72 Wn. App. 62, 67, 863 P.2d 137 (1993) (holding that the fact that defendant's trial counsel did not move for a curative instruction or mistrial "strongly suggests the argument did not appear [irreparably prejudicial] in the context of the trial"). Coleman only generally claims that "a curative instruction would be of little value, because the misconduct was pervasive, repetitive, and cumulative" and that the "prejudice was so great that no instruction would cure it." These

conclusory statements fail to meet the heightened requirement described in *Emery*, 174

Wn.2d at 761.

For these reasons, I concur in the result.

Díaz, J.